# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

BRYAN WILLIAMS, on behalf of himself
and those similarly situated,

    Plaintiff,

v.                                                    CASE NO: 8:09-cv-709-T-26MAP

KENCO LOGISTIC SERVICES, INC.,

    Defendant.
_____/

# **O R D E R**

Before the Court is Defendant's Motion for Summary Judgment and Undisputed Statement of Facts (Dkts. 41 & 47), the declarations of Henry Gonzalez of Kenco Logistic Services, LLC (Kenco), Steven Mihalik of Whirlpool, and Mark Ziccardi of Kenco (Dkts. 42, 44 & 46), the depositions of Mark Ziccardi and Steven Mihalik (Dkts. 43 & 45), various other exhibits filed by Defendant (Dkt. 48), Plaintiff's Response Memorandum in Opposition (Dkt. 53), and Plaintiff's Statement of Disputed Facts in Opposition with attachments including deposition excerpts. (Dkt. 54). After careful consideration of the motion, arguments, and the entire file, the Court concludes that the motion should be granted.

## **PERTINENT FACTS**

In this collective action brought pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §216(b) (the FLSA), Plaintiff Bryan Williams alleges that he was a delivery driver employed by Defendant Kenco. In addition to the Plaintiff, thirty-seven other individuals have consented to join in this collective action against Kenco. (Dkts. 2, 31, 32, 33, 34 & 39).[1] Kenco is a logistics company that provides a third party distribution service for Whirlpool, the shipper. (Dkt. 42, para. 3; 43, p. 8). Kenco's business entails shipping, receiving, warehousing, and some manufacturing. (Dkt. 43, p. 8). Whirlpool is the leaseholder of the warehouse located in Orlando.

For all times relevant to this case, goods manufactured out-of state by Whirlpool were shipped by Whirlpool from factory distribution centers (the FDCs) located in Ohio, California, Delaware, Indiana, Georgia, Iowa, Mississippi, Texas, Tennessee, Oklahoma, Arkansas, and Mexico. (Dkt. 42, para.4). None of the FDCs are in Florida. The goods include washers, dryers, refrigerators, ovens, microwave ovens, and other appliances. From the FDCs, products are shipped to a regional distribution center (the RDC) located in Orlando,[2] which is operated by Kenco. (Dkt. 42, para. 3; Dkt. 44, para. 3; Dkt. 45, p. 9). Local Distribution Centers (the LDCs) were located in Orlando (where the LDC is

---

[1] The parties filed a joint stipulation agreeing that for purposes of determining back pay only, each plaintiff worked 6.07 hours of overtime each week worked from March 2006 through December 2006, 3.47 hours of overtime each week worked in 2007, 2.72 hours of overtime each week worked in 2008, and 4.59 hours of overtime worked in 2009. (Dkt. 50).

[2] There are several RDCs across the country. (Dkt. 45, p. 21). For purposes of this case, only the RDC in Orlando will be pertinent.

part of the RDC), Ft. Myers, Tampa, and Pompano Beach. (Dkt. 42, para. 11; Dkt. 46, para. 10; Dkt. 45, pp. 11-13). The consent Plaintiffs are either former or current delivery drivers employed at one of the LDCs.

The facts developed at this point in the litigation are disputed, thereby leaving the matter at hand to determining whether those facts are material. Kenco directs the delivery drivers once the product has been delivered to the Orlando RDC after Whirlpool has directed Kenco to deliver product to specific customers. (Dkt. 44, para. 4 & 5). Kenco is not involved with the specific customer ordering, only the delivery set up for the Whirlpool customers, and as such, Kenco does not sell any items from the Orlando RDC. (Dkt. 46, para. 5; Dkt. 42, para. 6; Dkt. 44, paras. 5 & 7). All orders are placed with Whirlpool and parceled out from FDCs to the RDC in Orlando. Defendant maintains that 17% of the product shipped from FDCs to its RDCs is "committed product"[3] that is used to fill customer orders placed with Whirlpool prior to shipping. (Dkt. 44, para. 8). The appliances are shipped according to model number, not the serial number on a particular appliance. (Dkt. 45, pp. 24-26). Plaintiff, however, challenges this percentage on the basis that it covers other RDCs outside Florida and that the product is stored without regard to any particular customer or length of storage and are sometimes stored indefinitely in general storage. (Dkt. 45, pp. 20-21 & 26; Dkt. 43, pp. 13-15).

---

[3] According to Steven Mihalik, a senior supply chain analyst for Whirlpool, "committed product" is " a calculation . . . that says for a given shipment what percentage of the total is literally committed to an order at the destination, meaning there is an order waiting for that inventory upon receipt." (Dkt. 45, pp. 5 & 20).

According to Defendant, almost 44% of the trucks that deliver finished goods to the Orlando RDC contain "committed product" that is being shipped to fill existing customer orders. (Dkt. 44, para. 8; Dkt. 45, pp. 24-25). Plaintiff, on the other hand, asserts that the product is not committed in the sense that as long as the model number ordered is already in storage, which often occurs, Whirlpool does not know whether the items shipped from the FDCs are being used to fill existing customer orders or whether the orders are filled from existing inventories, which sometimes remain indefinitely. (Dkt. 45, p. 26; Dkt. 54, Exh. C, p. 26). Approximately 60% of the product shipped by Whirlpool is shipped pursuant to forecasted demands based on prior sales. (Dkt. 44, para. 11). Plaintiff points out that not all of this percentage is actually sold to customers because cancellations are not taken into account. (Dkt. 45, pp. 28 & 34).

The remaining 23%[4] of inventory in the RDC would be considered safety stock, which is shipped to accommodate any variance between the supply and demand. (Dkt. 44, para. 12; Dkt. 45, pp. 34 & 37). Plaintiff contends that this supports the fact that the inventory cannot be matched to any existing customer orders because they have no record of the serial numbers, the serial numbers do not correlate to a particular order, and the number of orders cancelled are not recorded or tracked. (Dkt. 45, pp. 18, 25, 28 & 32; Dkt. 43, pp. 20, 21, 40 & 49). Plaintiff also takes issue with Defendant's assertion that inventory is turned every 30 days because Kenco has no method by which it can account

---

[4] This percentage is all inventory other than the 17% of "committed product" and the 60% of forecasted product needed.

for how long the product remains in the RDC. (Dkt. 44, para. 14; Dkt. 46, para. 14; Dkt. 43, p. 22; Dkt. 54, Exh. D, paras. 18-19). Plaintiff Bryan Williams avers that the inbound products are received and placed in stows in no particular order and the trucks are prepared for customer delivery using model type and the product located on the closest stow. (Dkt. 54, Exh. D, paras. 9-12). Mr. Williams further avers that Kenco can determine how long a product has remained in the warehouse by labels placed on them, which reveals that most of the products stay there for several months and sometimes years, becoming obsolete. (Dkt. 54, Exh. D, paras. 13-15).

With respect to the home delivery haul aways (HDHAs), Defendant contends that they were immediately loaded on to trailers and shipped via truck to their recycler in Atlanta, Georgia, once a month. (Dkt. 43, pp. 55-58; Dkt. 41, p. 45). Plaintiff asserts that the trailers were sent to Georgia every two months, but any one trailer sits for four to five months to become full for shipping. (Dkt. 54, Exh. C, p. 37; Dkt. 43, p. 58). The witness relied upon for this information, Mark Ziccardi, had no role in the haul-away process. (Dkt. 43, p. 58). Defendant argues that even apart from the shipment of product into Florida, the HDHAs place the work of the collective plaintiffs within the MCA exemption.

## STANDARD OF REVIEW

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is material if "it is a legal element of the claim under the applicable substantive law which

might affect the outcome of the case." Burgos v. Chertoff, 274 Fed.Appx. 839 (11th Cir. 2008) (unpublished opinion) (citing Allen v. Tyson Foods, 121 F.3d 642, 646 (11th Cir. 1997)). Reasonable inferences must be drawn in the light most favorable to the nonmoving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Warren v. Crawford, 927 F.2d 559, 561-62 (11th Cir. 1991). Neither credibility determinations nor weighing the evidence may play any role in summary judgment proceedings. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## ANALYSIS

The sole issue in this summary judgment proceeding is whether the Motor Carrier Act, 49 U.S.C. §31501, *et seq*. (MCA) applies to exempt the employees of Kenco from the overtime provisions of the FLSA. If the exemption applies, then the collective Plaintiffs are not due overtime compensation for their activities. "Exemptions under the FLSA are to be construed narrowly against the employer who asserts them." Jeffrey v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995); Hodgson v. Colonnades, Inc., 472 F.2d 42, 47 (5th Cir. 1973).[5] The determination of whether employees are exempt from the requirements of the FLSA involves a question of fact. Hodgson, 472 F.2d at 47.

---

[5] In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

The "ultimate decision whether an employee is exempt is a question of law." Smith v. City of Jackson, Miss., 954 F.2d 296, 298 (5th Cir. 1992). The burden of showing that the employer is entitled to use the exemption lies with the employer. See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1156 (11th Cir. 2008).

The FLSA creates certain exemptions for paying the overtime rate to employees who work over a forty-hour work week. 29 U.S.C. §213. The particular exemption argued in this case is the MCA. 29 U.S.C. §213(b)(1).[6] The MCA grants power to the Secretary of Transportation to establish the qualifications and maximum number of hours of service of employees of motor carriers to promote safety of operation. 49 U.S.C. §31502(b)(1), (2); Baez v. Wells Fargo Armored Serv. Corp., 938 F.2d 180, 181-182 (11th Cir. 1991) (citing 29 C.F.R. §782.2 which states that the Secretary has power over those carriers it may assert jurisdiction over and the Secretary's power extends to employees of certain carriers who engage in activities that directly affect the safety of operation of motor vehicles in transportation on public highways in interstate commerce).

Plaintiff does not dispute that the Secretary possesses the power to exercise jurisdiction over Kenco. The question in this case is whether the employees of the carriers engage in activities of such a character that directly affect the safety of operation of motor vehicles in transportation on public highways of property in interstate

---

[6] "The provisions of section 207 of this title shall not apply with respect to —(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 . . ."

commerce, or whether the employees transport property in interstate commerce. Because the Plaintiff and collective Plaintiffs' job activities take place only in Florida by taking the Whirlpool appliances from the LDCs and delivering them to customers and taking the HDHAs back to the LDC, the question is whether the transportation is intrastate only or part of a "continuous stream of interstate travel." Walters v. American Coach Lines of Miami, Inc., 575 F.3d 1221, 1229 (11th Cir. 2009) (citing Chao v. First Class Coach, 214 F.Supp.2d 1263, 1276 (M.D. Fla. 2001)). To show the "continuous stream," the test is whether there is a "'practical continuity of movement' between the intrastate segment and the overall interstate flow." Walters, 575 F.3d at 1229. The shipper's intent, or Whirlpool's intent, must be "fixed and persisting" at the time of shipment. 29 C.F.R. §782.7(b)(2); see also Bilyou v. Dutchess Beer Distribs., Inc., 300 F.3d 217, 223-24 (2d Cir. 2002).

The Interstate Commerce Commission[7] promulgated a three-part test to assist in determining the shipper's fixed and persisting intent at the time of shipment. See Foxworthy v. Hiland Dairy Co., 997 F.2d 670, 672-73 (10 Cir. 1993) (quoting Ex Parte No. MC-48, Determination of Jurisdiction Over Transportation of Petroleum and Petroleum Products by Motor Carriers Within a Single State, 71 M.C.C. 17, 29 (1957)). The test is set forth and stated in terms of what is not a fixed and persisting intent to ship goods in interstate commerce as follows:

---

[7] The authority previously vested in the ICC was transferred to the Department of Transportation in 1983. P.L. 97-449, 96 Stat. 2413, 2438 (1983).

>       (I) At the time of shipment there is no specific order being
>       filled for a specific quantity of a given product to be moved
>       through to a specific destination beyond the terminal storage,
>       and (ii) the terminal storage is a distribution point or local
>       marketing facility from which specific amounts of the product
>       are sold or allocated, and (iii) transportation in the furtherance
>       of this distribution within the single State is specifically
>       arranged only after sale or allocation from storage.

29 C.F.R. §782.7(b)(2). In 1992, the DOT issued the following more updated factors to be considered in determining "fixed and persisting intent" to continue in interstate commerce:

> 1. Even if a shipper does not know the ultimate destination of specific shipments, it bases its determination on the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. This may include, but is not limited to, historical sales in the State, actual present orders, and relevant market surveys of need.
> 2. No processing or substantial product modification of substance occurs at the warehouse or distribution center. However, repackaging or reconfiguring (secondary packaging) may be performed.
> 3. While in the warehouse, the merchandise is subject to the shipper's control and direction to the subsequent transportation.
> 4. Modern tracking systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center.
> 5. The shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier.
> 6. The warehouse utilized is owned by the shipper.
> 7. The shipments move through the warehouse pursuant to a storage in transit provision.

57 Fed. Reg. at 19813; Advantage Indep. Union v. Sunoco, 2004 WL 1368808 at *7 (E.D. Pa. Jun. 16, 2004); Advantage Tank Lines, Inc., No. MC-C-30198, 10 I.C.C.2d 64 (Mar. 2, 1994).  The DOT further declared that the existence of one or more of the following additional factors would not be sufficient to break the continuity of the character of the commerce:

> 1. The shipper's lack of knowledge of the specific, ultimate destination or consignee at the time the shipment leaves its out-of-State origin;
> 2. Separate bills of lading for the inbound and outbound movements instead of through bills of lading;
> 3. Storage-in-transit tariff provisions;
> 4. Storage receipts issued by the warehouse distribution center;
> 5. Time limitations on storage;
> 6. Payment of transportation charges by the warehouse or distribution center, when the shipper or consignee is ultimately billed for these charges;
> 7. Routing of the outbound shipments by the warehouse or distribution center;
> 8. A change in carriers or transportation modes at the distribution facility;
> 9. Use of brokers retained by the shipper;
> 10. Use of a warehouse not owned by the shipper.

57 Fed. Reg. at 19813.

### **Delivery from the RDC**

Case law from various circuits has applied these tests to different factual scenarios. In Foxworthy, the Tenth Circuit concluded that shipments of dairy products processed in Arkansas and shipped to a distribution center in Oklahoma, from where it would be transported to a refrigerated trailer in Oklahoma where the product would be loaded on

trucks for delivery to customers, constituted interstate commerce. The delivery driver would also collect the used, empty plastic containers and return them to Arkansas. Under the first prong of the test, the dairy product was shipped pursuant to preexisting orders by specific customers, such as convenience stores, who agreed to stock a particular amount of a particular product. The second and third prongs were not met because the products were neither sold nor allocated from the refrigerated trailer and were not "held in storage or inventory pending the receipt of actual orders." Foxworthy, 997 F.2d at 673 (citing Baird v. Wagoner Transp. Co., 425 F.2d 407, 412 (6th Cir.)). The sales took place only after the product reached the customers. Other factors relied on included the short storage time in the refrigerated trailer of no more than 3 days, the total absence of commingling of product from the time it left Arkansas to the time it reached the trailer, and the lack of any pending inventory awaiting receipt of an actual order.[8] Unlike the cases involving dairy products, the Whirlpool appliances here do not possess a short self-life and the turnaround time can be quite lengthy after it reaches the warehouse. Additionally, no specific orders have been placed with an accompanying paper trail to ever match an appliance shipped into the warehouse to the actual customer who purchases any particular appliance.

---

[8] In an unpublished opinion, the Eleventh Circuit addressed a dairy product case, reaching the conclusion that interstate commerce existed to exempt the delivery driver from the FLSA. Mena v. McArthur Dairy, LLC, 352 Fed.Appx. 303 (11th Cir. 2009) (unpublished opinion). In Mena, the short shelf-life of the product was noted and the lack of any modification to the product after it reached the Miami warehouse from out-of-state.

In Galbreath v. Gulf Oil Corp., 413 F.2d 941 (5th Cir. 1969), a binding former Fifth Circuit case, 97% of petroleum products were shipped pursuant to specific customer contractual commitments. There was no commingling of the product from the refinery to the bulk plant to the gas station. The products did not stay at the bulk plant for an indeterminate period of time. The delivery drivers were held to be exempt from the overtime provisions of the FLSA. Unlike the petroleum cases, the Whirlpool appliances were not shipped pursuant to specific customer contracts.

Watkins v. Ameripride Servs., 375 F.3d 821 (9th Cir. 2004), however, determined that new uniforms stored at an in-state warehouse shipped from out-of-state, was intrastate commerce. Watkins presents a case in which the "indeterminate time" factor gave pause for finding a "practical continuity of movement." In Watkins, the delivery of new uniforms not taken from general inventory until after the customer placed an order did not constitute product delivered in interstate commerce. The new uniforms were considered fungible. The Ninth Circuit reasoned that if the intrastate warehouse is the only designated destination at the time of shipment from out of state to in-state for future delivery to customers yet to be identified, then the commerce is considered intrastate.[9]

Like the new uniforms in Watkins, the Whirlpool appliances were delivered to the RDC in Orlando for future delivery to customers not yet identified, although prior orders

---

[9] Other cases involving the delivery of beer and beverages seem to rest on whether the shipments are sent in anticipation of the needs of specific customers. See, e.g., Talton v. I.H. Caffey Dist. Co., Inc., 124 Fed.Appx. 760 (4th Cir. 2005).

placed were used to determine the number of appliances sent. Another similarity exists in the indeterminate amount of time the new uniforms and the appliances remain in the warehouse. Plaintiff has shown that neither Whirlpool nor Kenco has a system in place to reveal which appliances have remained in the warehouse long enough to reach obsolescence, but product does remain in the warehouse that has never left. These are only two factors, however, in the many more factors to consider, and thus, the cases involving appliances are instructive.

In a case involving delivery drivers for General Electric (GE), a district court addressed whether GE's intent was "fixed and persistent" at the time of shipment to determine the character of the commerce as either interstate or intrastate. Glanville v. Dupar, Inc., 2009 WL 3255292 (S.D. Tex. 2009). The court summarized the salient cases across the circuits with respect to the length of time the goods may pause within one state before reaching their final destination. Glanville, 2009 WL 3255292, at * 9.[10] The GE distribution center held enough appliances, based on forecasts of sales, specific customer

---

[10] The cases include Siller v. L & F Distribs., Ltd., 109 F.3d 765 (5th Cir. 1997) (holding between 6 and 28 days before delivery of out-of-state beer does not terminate interstate journey); Foxworthy v. Hiland Dairy Co., 997 F.2d 670 (10th Cir. 1993) (holding no more than 3 days before delivery of dairy products does not terminate interstate nature); Roberts v. Leonard W. Levine, 921 F.2d 804, 814 (8th Cir. 1990) (holding six-month storage before delivery does not terminate continuity of interstate commerce). One case holds that indefinite storage may change the character of the commerce. Watkins v. Ameripride Servs., 375 F.3d 821, 825 (9th Cir. 2004). Courts have always applied a totality of circumstances test to decide the character of the commerce. Atlantic Coast Line R.R. v. Standard Oil Co., 275 U.S. 257, 268, 48 S.Ct. 107, 72 L.Ed. 270 (1927); Siller, 109 F.3d at *2.

orders, "safety stock," and an "understanding" with larger customers about customer demand, to meet customer orders. The average length of time the GE appliances stayed in the warehouse was from 21 to 28 days. GE owned the distribution center, and the appliances were not processed or altered there. GE tracked each appliance "using real-time information" until the time it was delivered to a customer.

The court in <u>Glanville</u>, relied on <u>Ruiz v. Affinity Logistics Corp</u>., 2006 WL 3712942 (S.D. Cal. 2006), which involved appliances manufactured and sold by Sears. In <u>Ruiz</u>, the appliances sent to the direct distribution centers were based on orders that relied on the forecasting of sales that would be made by the stores. The customers could also special order directly from the manufacturer, in only 2 to 3 ½ percent of the Sears products, and delivery would be made within three days from the local distributing center to the customer. The court addressed the factors in the 1992 ICC Policy Statement and found that enough of the factors weighed in favor of finding the appliances delivered as part of a continuous movement in interstate commerce. Ruiz, the delivery driver, made a similar argument to the one made by Plaintiff here— that appliances would be diverted or re-designated from one customer to a different customer. The court, nevertheless, found that Sears had the requisite intent at the time of shipment. Whether the product is fungible or non-fungible is irrelevant in determining the nature of its transportation. <u>Ruiz</u>, at *8 (citing <u>Galbreath</u>, 413 F.2d at 946). Furthermore, manipulative commingling is of no concern where the shipments are moved from one state to a warehouse in a second state, as opposed to shipments moved to a warehouse in the state of manufacture

and some of the inventory is never sent to another state. Ruiz, at * 10 (citing State of Texas v. United States, 866 F.2d 1546, 1559 (5th Cir. 1989)).

Plaintiff's primary and best argument is that there is no practical continuity of interstate movement based on Whirlpool's failure to ship appliances pursuant to verifiable specific customer orders. The question is whether it is fatal to Kenco that Whirlpool could not trace the particular appliance, by serial number and not just model number, from the FDC to the RDC, absent specific customer orders. In Glanville, unlike Whirlpool in the instant case, GE could trace each appliance by real-time.[11] In Ruiz, there was actually a small percentage of appliances that were special ordered directly from the Sears manufacturer, which could be tracked to a specific customer all the way to home delivery. One fitting question is whether the Whirlpool appliances here can be considered as the new uniforms stored indefinitely in the warehouse in Watkins absent specific, traceable appliances to customer orders and absent proof that 100% of the appliances had not been stored for years.

As the court in Ruiz noted, the Watkins case did not outwardly address the additional factors set forth in the 1992 ICC policy. Ruiz, at *5. Considering the first factor, which assumes that the shipper does not know the ultimate destination of specific shipments but bases the amount to be shipped on projections of customer demand,

---

[11] This Court is not absolutely certain of what real-time tracking means, but the testimony in this case is that the serial numbers of each Whirlpool appliance could not be tracked until such time as it left the RDC for the LDCs and then customers.

Whirlpool's "committed product" is based on orders placed by customers. As long as there is some product which has been ordered, even if that order cannot be traced to the specific end customer, and the orders represent projections of customer demand or confirm historical sales, then the failure to know the precise destination of an appliance into someone's home will not destroy the shipper's intent with respect to the product. The Court finds that the testimony of the Kenco and Whirlpool employees confirms that some product was shipped based on orders, and a system was in place to confirm that the particular models sent from the FDC reached the RDC.[12] The fact that the tracing mechanisms of Whirlpool may not have been perfect will not destroy its intent.

Plaintiff also contends that the appliances were commingled at the RDC and the appliances remained at the RDC for an indefinite period of time. The second factor of the 1992 policy dictates against any substantial product modification in the warehouse or distribution center without penalizing for repackaging. The record in this case does not support a finding that any substantial modification of the appliances occurred at the RDC. With respect to the indeterminate time period that some of the appliances stayed in the warehouse, it is uncontroverted that most of the product was delivered to customers within thirty days of receipt in the RDC. The fact that a few appliances may have remained in the RDC, even perhaps for years, does not vitiate Whirlpool's intent. Based

---

[12] The paper system employed by Whirlpool and Kenco of proof of delivery, packing list, and inbound-putaway is documented in exhibits authenticated by Kenco employees Gonzalez (Dkt. 42) and Ziccardi (Dkt. 46), and Whirlpool employee Mihalik. (Dkt. 44).

on the record, the Court finds that Whirlpool, as leaseholder of the RDC, has met its burden of establishing its intent that the stay at the RDC did not interrupt the journey of the appliances in interstate commerce.

**Retrieval of the HDHAs**

The second argument of Defendant seeks to make the collection of the HDHAs evidence of interstate commerce. In Opelika Royal Crown Bottling Co. v. Goldberg, 299 F.2d 37, 42-43 (5th Cir. 1962), the former Fifth Circuit held that the routine return of empty Nehi bottles to the bottling source constituted interstate commerce. In Baez v. Wells Fargo Armoured Serv. Corp., 938 F.2d 180, 182 (11th Cir. 1991), the Eleventh Circuit reaffirmed Opelika; see also Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1025 (10th Cir. 1992) (holding that regular pick-up of empty Coca-Cola containers destined for out-of-state plants placed employees in interstate commerce). It is undisputed that the HDHAs are eventually taken to Atlanta for recycling, with a trailer leaving every two months, and is therefore considered interstate commerce in nature. The question is, based on this record, whether the evidence of Mr. Williams' participation in the hauling is sufficient to subject him to the Secretary of Transportation's jurisdiction. If his participation is *de minimus*, then he may not be subject to jurisdiction. See Reich v. American Driver Serv., Inc., 33 F.3d 1153 (9th Cir. 1994) (citing Coleman v. Jiffy June Farms, Inc., 324 F.Supp. 664, 669-70 (S.D. Ala. 1970), aff'd by, 458 F.2d 1139 (5th Cir. 1971). Mr. Williams' testimony reveals that he retrieves one HDHA six times a year. At the summary judgment stage, the Court finds that Defendant has not met its burden on the

*de minimus* argument. Having already decided the issue of whether the MCA exemption applies, and finding that it does, the motion for summary judgment will be granted.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1) Defendant's Motion for Summary Judgment (Dkt. 41) is **GRANTED**.

(2) The Clerk is directed to enter judgment for Defendant.

(3) The Clerk is directed to close this file.

**DONE AND ORDERED** at Tampa, Florida, on July 2, 2010.

s/*Richard A. Lazzara*
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**

<u>COPIES FURNISHED TO</u>:
Counsel of Record